The next case called for oral argument is People v. Rodgers. Counsel? Good morning, your honors. May it please the court, my name is Gilbert Cisan. I represent the defendant appellate, Brian Rodgers, in this case. Defendant appellate appeals from the jury verdict rendered against him. The jury convicted him of solicitation for murder for hire in October of 2009. And we are appealing based on five points. The first is that there was not a legitimate order that complied with the statutory requirements for the rendering of an eavesdropping device. Second, that the non-foutan device could not be used to retroactively supply the required findings or the things that are required in the order. The third is that there is no probable cause to initiate the application in the first place because the hearsay was uncooperative. Fourth, that the entrapment instruction was wrongfully denied or wrongfully not given. And fifth, that an alternative submission, that there was insufficient evidence given the fact that no one was actually procured to actually solicit, to actually do the actual murder in this case. I'm going to take the first two points together because they are obviously linked. The issue there is simple. There was no written order that required an eavesdropping device. It was there in court with the required statutory findings and with the requirements that statute requires of that order within the court records to determine whether or not this eavesdropping device could be used. I don't think the state disputes. There was no written order. That's correct. You think a written order is required for every entry that authorizes an act? No, Your Honor, I don't think a written order is required. As a matter of fact, the statute doesn't indicate that a written order is required. But there must be some contemporaneous evidence in the record to indicate that an order was indeed rendered. That's the key dispute between the state and the defense here. The state believes that an oral order was in fact rendered. We don't believe that there was. The only thing that the state can point to is one thing that might show that an order was actually rendered on that day, August 3, 2007. That is the petition for the overhear device. Now, the petition for the overhear device does outline parties to be involved. It does outline a time period to be reported as to when the device was used. And it also outlines who was going to be subject to this eavesdropping device. But the petition is simply a request. Now, the state focuses very hard on the fact that Judge Bowie signed that petition. But the point is the statute requires a sworn application. The only way that application can be sworn is in front of that judge. So, again, without some sort of intent, without some sort of wording on the petition, there is no evidence of an order being issued. If, for example, there had been language such as sole order or granted or approved, I would concede that we would lose this point. But there is no language on the space of the petition itself that would indicate that an order was, in fact, issued. Now, the second point, the second thing that the state points to is the fact that you have the August 22nd preservation order as well as the October 12, 2007 Nell Proton order as further evidence that an order was, in fact, issued. But the problem with that is simply this. The case law in Illinois is very clear that if you're going to use the Nell Proton device, it must be based on some sort of note, memorandum, or filing in the court records that was contemporaneously made at the time of the incident in question. In this case, August 3rd, 2007, when the actual over-year order was purportedly granted. We know the time of the day when that order was purportedly entered. And was there a docket entry of any kind, any notation of any kind? In response to your first question, Judge, I do not know the time of day. My memory fails me on that. But with respect to the docket entry, no. There was no docket entry on August 3rd, 2007 that indicated order granted. Nothing like that on August 3rd indicated that. The next entry that we have is August 22nd, 2007, which indicates that Judge Bowie received recordings and is ordering them preserved. Now, the state comes in and says, well, that's evidence that an order was, in fact, made on August 3rd. But the problem is that that is not contemporaneous with August 3rd, 2007. That's two and a half weeks later. Now, the October 12th, 2007 docket entry where Judge Bowie indicates that, well, I just didn't enter the order and I'm now providing a non-proton order that relates back to August 3rd, also is not contemporaneously made. The only evidence we have of an order with the required statutory findings and the requirements of the order pursuant to Illinois law is that non-proton order. That's it. But, again, not contemporaneously made. I would concede that if, for example, there was a blank order that wasn't executed or signed, this might be a different case. But, again, nothing in the record indicates there was even that, a very blank order. So, again, we simply point to the fact that there's no contemporaneous evidence, no definite evidence in the record to indicate that. The two cases that have been cited are brief, which was Dressler and I believe it was Enright, and it's a parenthetical. We believe it addresses this point. In Dressler, the issue was whether or not the defendant or the plaintiff could appeal after he was, after some of the judgment was found against him. But the problem was there was a required set of findings that needed to be made. In other words, the judge specifically had to say that there was just no just cause to delay the enforcement or to delay the appeal. And in that case, the judge issued a non-quotat several days later to permit the plaintiff to do just that. But the appellate court in that case in Dressler indicated that, well, there was nothing in the record to indicate that the required statutory findings were made. Hence, the non-quotat was ineffective. Same thing here, Judge. Again, certain required statutory findings that must be made, and certain things that an order is required for it to be valid under Illinois law. Again, there's nothing, as of August 3, 2007, that would indicate that it's indeed the case. Now, the court, now the state, cites to a number of cases to support the proposition that you could look to the entire record. But again, if you look closely at the cases, you'll see that it still falls in line with the notion of there must be some contemporaneous entry in the record. For example, they cite to the notion of Thompson, the case of Thompson out of the 2nd District. In there, there was an oral order indicating that a written order would later follow, and then a non-quotat followed several days later. But there was a docket entry that indicated, in fact, that a written order was to follow. So therefore, it was appropriate for the court to come back and use the non-quotat device. The second was Housman. In there, the court actually now had crossed the wrong case. It was in a pretrial order setting out future timelines for the trial of the case. But the problem is they actually now crossed the case that that pretrial order was referencing. Well, the court indicated there that there was something sufficient in the paper itself to indicate that that was wrong and the non-quotat device could be used. Because obviously, you're not going to now cross a case of which you're setting future trial lines and deadlines going down the line. So again, this issue 1 and 2 comes down to whether or not the non-quotat device can be used. You know, the state paints it as a clerical error, but we don't believe that's the case. The Illinois Supreme Court has made it very, very clear that there are limited set of circumstances when the non-quotat device can be used. In other words, it states that it cannot be used to supply admitted judicial action. Now, granted, I'll grant you that maybe Judge Bowie didn't intend to grant the court. But if he didn't put the order in there, it's ineffective. Everybody knows that. It's black letter law. You know, if the order had been in it but had been sent in but not signed, if there was a documentary, this would be a different case. But there's nothing in the record. What about if he orally authorized it at 2 o'clock in the morning? If he orally authorized it at 2 o'clock in the morning, then my argument would be that there's got to be some notation in the record. Some notation in the record that requires statutory court findings were made and the order set forth the requirements under Illinois law. It would be done under a couple of ways. What Judge Bowie should have done was that he should have put it on the record. If there was some sort of contemporaneous reporting of this thing, then yes, I would concede that there's something in the record that would point to, as of the time that the order was made, that would justify the use of the non-quotat device. In this case, there simply is nothing. And that's why we believe that the non-quotat device should not be used in this manner. Now, if there are no further questions on the issue of the non-quotat device, I'll proceed next to the probable cause issue. Our argument is very simple. It is simply that the unadulterated hearsay in the petition for application for the overheard device was insufficient as a matter of law to provide probable cause. Now, the Wassil case provides the analytical paradigm of which we need to operate. Number one, it says, yes, an application for an overheard device can be based on hearsay, but there must be a substantial basis for crediting that hearsay. There are two ways to do this. Number one, you can follow the statute and provide additional evidence. That was done, for example, in the case of Hammer, where, for example, in addition to the application, the law enforcement officer provided the affidavit of the actual person that was actually going to wear the watch. So that was additional evidence, plus there was a supplemental affidavit provided by the officer that outlined further instances of corroboration of his investigation in that case. The second way, so the first way is not an issue. The second is that it can be done on the basis of the application itself. In other words, we analyze the four corners of the application, and is there sufficient evidence to determine if there is a probable cause? But the problem when you have hearsay is that you need something a little more. In other words, we just don't, you know, accuse people without some basis of some form of corroboration. So typically, the case law has indicated there are a couple ways that you can credit the hearsay in the application itself. For example, you can actually indicate that this informant is reliable, that you've used that person before. Again, nothing in the record indicating this is the case. As a matter of fact, Captain Harville testified in the Motion for Suppression hearing and indicated that he had not experienced this witness before, and he was unaware of, in other words, he had no prior knowledge of this witness. So he was unsure of this person's reliability. The other thing, too, is corroboration. Did Captain Harville corroborate some of the allegations that Ms. Pylas, Deborah Pylas, the one who was going to wear the mask, made in support of the application? Well, Captain Harville's testimony in the suppression hearing is very telling. He indicates in response to counsel's question that, well, you know, the recording device is corroborating her allegations. Again, inappropriate. Analyze the application at the time that it's submitted, not based on facts that are acquired afterward to support what was made in the application before. And then finally, the state points, and I'll concede that this is a point that probably cuts in the state's favor, but the notion that if, for example, you admit to certain wrongdoing, that does lend some credibility to your allegations. And in that regard, let's cite the Weston case. Well, first of all, there's a couple points that I want to make between Ms. Pylas and the Weston case. In Weston, the informant in that case was already in jail for murder. He was already accused of murder. He was already sitting there. And basically, he gave additional information to police about another shooting in which he implicated himself. And there, the court decided that, well, number one, there's a basis for crediting that testimony because, number one, there's no incentive for him to lie because he was already in jail and he was probably not getting out because of the serious charges that he was already facing on the murder charge. The court also pointed out that there was additional police investigation which corroborated that first informant's testimony. In this case, entirely different. Ms. Pylas comes in, and yes, she admits to the investigator Darnell that she was engaged in willfram. That's the one part where she engages and she says, okay, I'm involved in some wrongdoing. But then she points the finger at Mr. Rogers and says, well, as a matter of fact, Mr. Rogers, I've been in several conversations with Mr. Rogers indicating that he wants to kill his uncle, Troy Schlenker. And so, again, does she have an incentive to lie? Absolutely. She wants to stay out of jail. She admitted to willfram already. Now she wants to stay out of jail. It should be noted, Judge, that Mr. Rogers, in a separate case, was actually charged with willfram, but Ms. Pylas was not. So one of the allegations, one of the factors that the court looked at in Wesson was did they receive a deal or in exchange for the testimony? Well, granted, I don't know whether, in fact, there was actually a deal in place. All I know is Ms. Pylas was never charged with willfram or an accomplice to willfram. The second thing that should be pointed out, Judge, is that the allegations in the application itself point to, it should have raised, it should have raised some indicative that there might be credibility problems with this witness. For example, in her statements to Darnell, she says, well, yeah, I was paid, I was offered $10,000 to find someone to kill Troy Schlenker. But in that same interview, in the separate interview after with Captain Harpel, she indicates, well, I was paid between $5,000 to $10,000 to do willfram. Which one is it? You know, again, no cooperation. Another point that should be noted, Judge, Your Honors, is the fact that she mentioned in her report that he did not have, Mr. Rogers, my client, did not have a valid FOIA card, and therefore he, she was required to buy ammunition for him. Well, at trial, the state conceded that Mr. Rogers had a valid FOIA card and, in fact, could purchase his own ammunition. That was a simple matter for Captain Harpel to corroborate. A very simple thing that should have run into the system and said, boom, Mr. Rogers has a valid FOIA card. Didn't do it. Again, another telling point is in the affidavit application itself. She indicates, Ms. Pilots indicates that she received a call prior to arriving for the interview that indicated a call from my client, Brian Rogers, that was left of her voicemail. Again, the application doesn't indicate whether Captain Harpel listened to that voicemail. Again, simple. I would imagine it doesn't take much. It doesn't take much to corroborate these allegations. But again, no corroboration was done. None at all. I mean, simple matters of checking the criminal history of Ms. Pilots, checking whether Mr. Rogers had a valid FOIA card. Any of those facts, had they been done, we would concede that this issue is lost. You know, but it wasn't done. The final thing that the State can hang her head on is, was the application detailed enough? There are two cases. One case, for example, that stands for the proposition that the detail of the application is sufficient to credit a hearsay. Well, Ressler stands for that proposition. But Ressler, the facts are entirely different. Number one, the credibility of the testifying witness was not an issue. It was a child. And as a matter of fact, the affidavit was 20 times more detailed than what was provided for Hugh. The affidavit in Ressler provided detailed accounts of the 20 to 25 instances of sexual misconduct. It also provided detailed accounts of the youth's intelligence, age, background, and the circumstances in which these allegations were derived under question. We don't have that here. I mean, we don't even have specific dates of when these requirements occurred. In other words, for example, in Wausau, a case that we are working on, in Wausau, the application was found deficient, but there was actually specific dates of when these facts occurred. Now granted, there are details as to the circumstances of why Mr. Rogers, why his own opinion, but again, uncorroborated. This is another point that I'd like to point the judges to. Before Captain Harwell interviewed his pilots to detail, he went to Troy Schlenker. He interviewed Troy Schlenker, and he says, do you think Mr. Rogers is capable of doing this? All Mr. Schlenker offers is his opinion without more in the affidavit indicating that, yeah, I think he's capable of doing it, but I think I can protect myself. Again, nothing, if it had been reversed, this would be a different story. If he had interviewed Ms. Piles first and then came to Troy Schlenker and said, hey, Troy, this is what she says why Brian Rogers is mad at you. This is why he says why he wants you killed. Do you agree with that? Did you have a dispute over the will? Did you have anything like that? Yeah, boom, corroboration, done. We sit down. Again, didn't happen. Another thing, it would have been a simple matter to pull the court records to indicate whether there was a will fraud, will estate fraud case currently pending. Was that done? At least not according to the application. So again, we don't believe there's sufficient probable cause to warrant the granting of the application. The fourth point, Judge, and I know my time is running out. Well, my time is almost out. And I can bring this up on rebuttal if we need to. But again, we have a traffic construction. And it does seem a little odd that we are arguing this. I'll grant you that in the first instance. But the case law is clear. I will agree with the state that you must admit to the crime and the elements of the crime. But the standard is very different. The standard in this instance is one that favors us. In other words, it's sort of a reverse sufficiency of the evidence argument. All favorable evidence in light in favor of the defendant as opposed to the state. Because the issue of entrapment isn't one for the trial or fact. The jury should not be deprived of that role unless there's not even the issue of evidence that that can be satisfied. We believe that we satisfy the slight out of the standard. Because at once, while yes, he does say that it was a joke. Yes, he denied the intent to kill Zumbel. There's also conflicting evidence that in any case, Zumbel was stuck in the trunk. There's also conflicting evidence that he was worried that I'm going to be worried if I don't pay. What's going to happen to you if I don't pay? All those raises an intent or at least the inference that, for example, that we satisfy the court. And then secondly, if I might point out, is the Walker case, which we cited in our reply brief. That stands for the proposition that when there is conflicting testimony, the benefit of the doubt should go to the defendant. In that case, the defendant is charged with a trial testifying who says, I didn't know that there was going to be a cocaine transaction in place. But then he contradicts himself later on and says, well, yeah, I think the two individuals together in the out, they were looking for cocaine. Again, conflicting testimony. The point is, and I will... Go ahead. The point is, Judge, is that when we have conflicting testimony, the conflict should be that, oh, yeah, well, I don't believe that testimony or the other testimony. Thank you, counsel. Thank you, counsel. My name is Sharon Shanahan, and I represent the New York District Court of Appeals, and I'm here to talk to you about the non-protonc order dated August 3rd, 2007. Now, the first thing we have to decide here is what is a non-protonc order. In its simplest terms, it is simply an order by a judge saying, I remember that on this date, I intended to enter an order that said this. Both the United States Supreme Court and our Supreme Court have long held that a non-protonc order is always admissible when a decree was ordered or intended to be ordered, and it was omitted to be done only by the inadvertence of the court. That's Danforth v. Danforth, the Illinois Supreme Court, and Siding Gray v. Brignardellio in the United States Supreme Court. Now, case law interpreting non-protonc orders establishes that these orders cannot be based solely on the judge's recollections. There must be something in the record on the date in question which supports the judge's recollection. Now, this evidence doesn't have to be, what the defendant seems to be arguing that it is, an order. I mean, he said at one point, if there was language in the docket sheet or on the petition so ordered, then that would be good enough, but then we wouldn't even be here. There would be a contemporaneous order. There does not have to be an order. There has to be something which indicates that the judge's recollection is correct. Now, these can be a note, a memorandum from the record, quasi-records, anything in the record before the court other than just the judge's memory alone. In this case, there's not. What is that? Because, I mean, clearly on the day that the order was allegedly authorized, there was no docket entry, there was no written notation, there was nothing. There wasn't anything for a period of time until somebody said there's no order here, right? So what do we have to corroborate that? Quite a bit, actually, much more than the defendant says. First of all, I'd like to kind of procedurally put this case in. There was no case here. There was no, they were just investigating. This was a private investigator working on a civil case, which is the estate of Mr. Rogers' grandfather and Mr. Schlenker's father. Suddenly, the defendant and his mother say, we have another will. So the estate hired a private investigator, and the private investigator did a very reasonable thing, which is to go talk to people that signed this new will, and one of those people was Ms. Pylist. While he's talking to Ms. Pylist, she tells him, yes, I knew that I filed a false, or signed a false will, and I also talked to him about finding someone to kill his uncle. No civil criminal case here involved at all. The private investigator says, basically, wow, you better go talk to the state's attorney about this, to the police about this, to somebody about this, and she comes. They're not looking for her. She comes to them. I ran into a term I hadn't heard before. I think it's an MR case, but that basically means that's what we're doing. We're getting information to see if there is anything going on here. So that's why there's not a lot of, there's not a case file yet when this happened. Now, getting back to what is on documents the date of August 3rd. First of all, we have Captain Harville's police report, which is quite detailed and attached to the petition for the eavesdrop order and incorporated by reference. We have the petition itself, which is dated August 3rd. We have the assistant state's attorney's approval for a petition for an eavesdrop order. We have Ms. Pylist's consent to the order here. We have Judge Bowie's consent that appeared before him and requested an eavesdrop order. We have Captain Harville's supplementary report, which filed on August 3rd, that says on Friday, August 3rd, 2007, he had obtained a state-authorized overhear issued by Judge Mark Bowie to record any conversations by the use of an electronic eavesdropping device between informant Debbie Pylist's defendant and his mother to record any conversations planning the murder of Roy Schwenker. All of those documents are in the record and dated on August 3rd. Now, the defendant says that the flaw in the state's argument is that there is an assumption that an eavesdrop order actually issued after all of that. Well, my stake in this court is, if you take all of those documents that I just told you about and in particular Judge Bowie's signature on the petition, there can be no doubt that Captain Harville appeared in front of Judge Bowie that night. So you're only left with three things that he could have done. Judge Bowie could have denied the order and said, no, no eavesdropping. He could have said, let me think about it for a while, and he could have granted the order. Now, I noted initially that a non-proton quarter cannot be entered solely on a judge's record, and I certainly disregard what the judge says he did remember. Moreover, as noted in People X. Housby v. Morris, if there are documents that support the order that are dated contemporaneously, then the court can also look to the record as a whole. So we have, in addition to the contemporaneously filed documents, we have Judge Bowie's non-proton quarter. We have a docket sheet in Judge Bowie's handwriting which says that the original, quote, the original order authorizing over here was inadvertently not executed by the court. Captain Harville appeared before the court on 8-307 and the court authorized the petition but failed to sign the order. Judge Bowie also pointed out in that docket sheet entry that he had entered a quarter for preservation on 8-22. Here again, I think that the, that preservation order is critical. This is a document dated August 27th, so just a couple of weeks after this happened. On one page, it's a one page document, it has two parts to it. The top part is the return of eavesdrop recordings by Captain Harville. That part says that he is, that the document is return of eavesdrop recordings, quote, as I recommend. The bottom half is an order for preservation, the one referenced by Judge Bowie in the docket sheet entry, which says that finding the eavesdrop recordings to, quote, to be within the order authorizing the use of eavesdropping. We have several documents that were filed on the day that lead to the conclusion that the petition was certainly at least presented to Judge Bowie. Then we have the record as a whole, which leaves no doubt whatsoever that the order was entered. This is reflected by Captain Harville's complimentary report filed that same day, August 3rd, which says that he's doing this pursuant to the order entered on that day. It's reflected by the report of eavesdrop recordings filed a couple of weeks later and by Judge Bowie's order of preservation, both which say it is under the order authorizing eavesdropping. All of these documents together lead to the inescapable conclusion that there is more than sufficient evidence that Judge Bowie did enter an order authorizing this eavesdropping. That leads us to the question of whether the omission is ministerial or judicial. This is an important distinction which the defendant overlooks because the rendition of an order and the entry of an order are different in nature, and that's People v. Redmond. The rendition of an order is a judicial act, but its entry upon the record is merely ministerial. A judgment is not what is entered, but what is ordered and considered. The entry may express more or less than what's directed by the court, or it may be neglected altogether. This is all language from Redmond. Yet in none of these cases is the judgment of the court any less its judgment than though it were accurately entered. That which the court performs judicially or orders to be performed is not to be avoided by the action or want of action of the judges in their ministerial capacity. Justice Waxman, as you noted, there is nothing in the statute that says that this has to be a written order. The statute does not require it. This likely reflects legislative deference to the judiciary to decide how the case is handled. Any finding to the contrary means that two weeks after this order supposedly, two weeks after August 3rd, and again two months later, Judge Boyd intentionally filed false orders attesting to an order he never made. Apparently a Union County police captain also filed false police reports and presented a false return of eavesdrop recordings to a sitting judge attesting to the fact that the overhears were obtained under a court order issued on August 3rd, 2007. Now I'd like to take a few minutes to discuss something that defendant has not addressed on oral argument and gives short shrift to in his reply brief, and that is application of the good faith exception to this case, assuming that there was some error in the non-proton order. One of the things that becomes apparent very quickly when you start looking at eavesdrops is that they are reviewed very similarly to search warrants. Same standards are applied throughout, and therefore I would posit that the good faith exception applies to eavesdrop. And I have presented this court, the case of United States versus Moore, which I'm going to discuss in depth in just a moment, but I want to note that the only thing the defendant says about Moore is that the good faith exception doesn't apply because United States versus Leon doesn't apply to statutory cases, it only applies to constitutional cases. First of all, I don't see that in Moore, and I certainly don't see it in Leon, that the deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful or at least very negligent conduct, which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers or in their future counterparts a greater degree of care towards the rights of an accused. When the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force. Leon goes on to say that when an officer acting with objective good faith has obtained an order via a search warrant or an eavesdrop from a judge or the judge's error rather than for his own cannot logically contribute to the deterrence of the Fourth Amendment violations. As I said, the defendant says that the Leon analysis applies to constitutional claims, not statutory claims. And he says people versus Moore recognizes this. This is not true. The Moore court was dealing with the Eighth Circuit federal decision and it's dealing with the federal eavesdrop statute. They know that Congress followed the constitutional standards of Berger versus New York and Katz versus United States to United States Supreme Court decisions, which simply state that the use of electronic devices to capture conversation is served within the meaning of the Fourth Amendment. And that it says, Moore says that Congress followed those constitutional standards in drafting the federal statute. Moore does not say that Leon only applies to constitutional claims. And in fact, there's a very interesting footnote in Moore that notes that when determining whether a state court requires a cap is insufficient on its face, it's logical to assess the order's sufficiency by comparing it with the form of order typically used by that court. The Moore court also goes on to note that the Nebraska statute and the federal statute are virtually identical. Similarly, the Illinois statute and the federal statute are virtually identical. And I would note that 725 ILCS 5 slash 114 dash 12 is the statutory provision which says what Leon says, which is that the court shall not suppress evidence which is otherwise admissible in a criminal proceeding if the court determines that the evidence was seized by a peace officer who acted in good faith. Now, United States versus Moore is as close to being identical to this case as one could possibly imagine. There, as here, the judge heard the petitioner for the eavesdrop, signed all the other relevant documents, but failed to execute the order allowing the eavesdrop. First, and this applies to my earlier argument, the Moore court found the error to be a harmless technical defect because the statute did not require a written order. Similarly, the Illinois statute does not require a written order. The Moore court went on to conclude that the Leon good faith principles apply to eavesdrop issues. The Moore court noted that the police officer left the judge's chambers believing that the judge had approved the wiretap application and that the proposed wiretap order had been entered. He had no need to look at the wiretap order thereafter. The Moore court concluded that the police conduct was objectively reasonable and largely error free. The Moore court determined that it was the judge, not the police officer, who made the critical mistake. And that language in Moore is a direct quote from Leon. Because the law, the Moore court concluded that because the law enforcement officers acted reasonably and complied with the core statutory requirements of the wiretap law in applying for and executing the wiretap order that Leon required that the motion to suppress be denied. In this case, there is no doubt that Captain Harville went to Judge Boyd with a proper petition. You can look at it in the record and all of the he notes that. Let me interrupt you because your time is running out here. Tell me briefly what did Judge Dolan do to support her finding that Judge Bowie intended to enter an order, just failed to do so. What was the nature of that proceeding? Evidence? Just reviewing the record? What was it? Do you know? There was a hearing in which Captain Harville testified. She looked at the record of the previous filings. She discusses many of the documents that I've discussed with you here today. Anything from Judge Bowie? I don't believe so. We'll read the record. As you say, I'm about out of time. I think even if, as I said, I think this is a proper entry of a pro-trump order. I think even if it wasn't, that the good faith exception applies because Captain Harville did everything he should have done and came out of the judge's chambers thinking he had a valid search warrant. And there is no point in there's nothing more he could have done. He erred away with the judge. And so for those reasons, I would say that this order was properly entered and should be affirmed. Thank you, counsel. Counsel? Thank you, Your Honors. Just to briefly respond to the points made by counsel. With respect to the supplementary report, I'd like to point the court to C-148, which is the record sheet of C-148. That indicates several things that were in the court file at the time. Number one, the petition for order authorizing the use of the eavesdropping device. And then the other documents filed on 8-22-07. The supplemental report of Mr. Harville that counsel first drew while made on August 3rd is not formally part of the record, at least according to this record sheet under C-148. In that vein, we point the court to the first of his West Bank v. Hoagland case, where it indicated the judge's notes indicated that he supported the evidence of a non-court trial order. The judge's notes weren't part of the trial record and the court of Hoagland didn't even consider it. The second point on the good faith exception in the United States v. Moore. First of all, U.S. v. Moore, number one, is an Eighth Circuit case, but it is a little bit different than what the state reports to the court. It's a little bit different in that it's not a bank order involved. So in all the big shuffling, you know, I think the agent testified, yeah, I saw all the documents, the order, the petition, and I saw the judge sign it. He just forgot to look to see whether or not the judge actually signed that order, so he went out. And that was the basis for the court's determination that the officer acted in good faith. Here, distinctly different. Notwithstanding whether the good faith exception applies or not, let's assume for the moment that it does. Number one, you have to assess the reasonability of the officer's perceptions, of the officer's actions. Now, what officer would go out and execute a search warrant or execute an eavesdrop order or execute an eavesdrop without an order? You know, even if it's a blank, fine. You know, at least you have one. But here he didn't. And in that sense, I would say that Captain Harbaugh's actions were unreasonable under the good faith exception of Leon, and Leon doesn't stand for that proposition. Because Leon only points out, do you have a good basis for relying on what you did? You had an order, but in Moore, it's because the officer had an order in place, just didn't look to see whether it was signed. In this case, we have none. He has no reasonable basis for concluding that there was an order issued, other than the fact that maybe Judge Bowie signed the petition. But again, the petition itself is couched in the language of a request. Judge Bowie's signature in and of itself is insufficient to turn it into an order. Now, Judge, you mentioned a comment, you mentioned a question that stated what did Judge Donnelly do with respect to this motion to vacate. She did take evidence. As a matter of fact, there's nothing from the record indicating that Judge Bowie testified or an affidavit from Judge Bowie. What Judge Donnelly did was also improper, because she relied specifically, if you look at the record in her decision, she indicates that she relied on the grand jury testimony of Captain Harbaugh as part of the basis for saying that the non-quotient order was valid. Illinois law is very clear. You cannot rely on ex parte affidavits or testimony to support the finding or to support the use of a non-quotient device. Grand jury testimony is simply that type of testimony. It is ex parte in nature, and in that sense we believe Judge Donnelly erred. For all the foregoing reasons, unless there are any further questions, this would be the trial court error in this case. It should be a manufactured trial. Was there anything about Judge Bowie's signature that indicated any action? Other than Judge Wilk. If you're looking at the documents on August 3rd, 2007, no. The next action taken by Judge Bowie was his signing of the order of preservation on August 22nd. So it wasn't so ordered or approved or anything. It was his signature on the documents. It was his signature on the documents, but if you look at the petition, he signs the petition, but it says he signs it after subscribed and sworn to before this third day of August 2007. Again, that is a sworn application. That is a requirement by statute. But no, other than that, thank you. Thank you, counsel. We appreciate the briefs and arguments.